## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

1) THE ADVOCACY COUNCIL,    )
2) ALL IN ONE PROJECT,    )
3) THE PEOPLES FOUNDATION,    )
4) ENDING VIOLENCE EVERYWHERE, )
    )
    Plaintiffs,    )
    )
vs.    )    Case No.  CIV-18-304-HE
    )    **JURY TRIAL DEMANDED**
1) DAMON T. HININGER, PRESIDENT )
    AND CHIEF EXECUTIVE OFFICER )
    OF CORE CIVIC, INC.;    )
    *and its subsidiaries*;    )
2) GEORGE ZOLEY, CHAIRMAN OF )
    THE BOARD, CEO AND FOUNDER )
    OF THE GEO GROUP, INC.    )
    *and its subsidiaries*;    )
3) J. MICHAEL QUINLAN,    )
    *an individual*,    )
4) FRANK KEATING,    )
    *an individual*,    )
5) MARY FALLIN, GOVERNOR,    )
    STATE OF OKLAHOMA;    )
6) JOE ALLBAUGH, DIRECTOR,    )
    OKLAHOMA DEPARTMENT OF )
    CORRECTIONS,    )
7) DELYNN FUDGE, EXECUTIVE )
    DIRECTOR, OKLAHOMA PARDON )
    AND PAROLE BOARD;    )
    )
    Defendants.    )

## CLASS ACTION COMPLAINT

## INTRODUCTION

Over the course of approximately 21-years, Defendants Quinlan, Hininger, CoreCivic,

Zoley, and the GEO Group have engaged in a conspiracy to influence high-ranking

1

officials of the State of Oklahoma to incarcerate Oklahoma citizens to gain and increase revenue from the State of Oklahoma.  Both CCA and The GEO Group made campaign contributions and in-kind gifts only to high ranking Legislators who would vote and/or take actions to pass legislation that enriched CCA and GEO and that obstructed criminal justice reform legislation.  Defendant CCA and GEO are engaged in ongoing violations of the Hobbs Act.

As a result of the lobbying and influence of legislation under the guise of providing consulting services, Defendants CCA and GEO targeted or caused the targeting of African American citizens of Oklahoma for confinement and disproportionate terms of imprisonment.   Additionally, Defendants CCA and Defendants GEO extended or caused the terms of prisoners' imprisonment to be extended by obstructing parole release.

Plaintiffs All In One Project and the Peoples Foundation allege violations by all named defendants that are specific to prison and parole board operations in Oklahoma.  Plaintiffs The Advocacy Council and Ending Violence Everywhere bring their claims against Defendants CCA and GEO for targeting African Americans for incarceration in Oklahoma, Louisiana, Mississippi, Alabama, Georgia, and Florida.

## PARTIES

*Plaintiffs*

1. The Advocacy Council is a transcultural membership organization that is focused on all aspects of racial and social justice reform.  The Advocacy Council's members are African American citizens, prisoners, prisoners' family

2

members, teachers, mental health service providers, former legislators, and an inter-faith coalition of clergy.

2.  The AllInOne Project is a 501(c)(3) membership organization whose members are Oklahoma prisoners, prisoners' family members, and private prison abolitionists.   AllInOne Project members hold joint membership with the Oklahoma City Chapter of the NAACP.  The AllInOne Project's mission is to investigate, expose and remedy systemic racial discrimination in Oklahoma; to facilitate release and successful (re)integration of persons who are wrongfully convicted or disproportionately imprisoned; and to end Oklahoma's pattern and practice of racially inequitable treatment by Oklahoma judicial system and Pardon and Parole Board.

3.  The Peoples Foundation is a 501(c)(3) membership organization with the mission of exposing and remedying systemic racial discrimination by non-violent means.

4.  Ending Violence Everywhere ("EVE") is a membership organization that advocates for protection and wrap-around community care for victims of physical and psychological abuse by any person or institution.  EVE members bring this action on behalf of children of incarcerated parents, female prisoners, and community stakeholders who have lost state funding for mental health and services.  EVE's mission is to expose and stop the expansion of correctional control in the form of state-ordered substance abuse treatment that is operated by subsidiaries of prison corporations.

3

*Defendants*

5. Defendant J. Michael Quinlan, is an individual and resident of the state of Tennessee and, at all times material to this case, was Vice President of Corrections Corporation of America.

6. Defendant Damon T. Hininger, President and Chief Executive Officer of CoreCivic, Incorporated and its subsidiaries.

7. Defendant CoreCivic (formerly Corrections Corporation of America) is a for-profit corporation incorporated under the laws of Maryland.  CoreCivic / CCA owns and/or operates prisons and halfway houses in the state of Oklahoma.

8. Defendant George Zoley is Chairman of the Board, Chief Executive Officer and Founder of The GEO Group, Incorporated.

9. Defendant The GEO Group  is a for-profit business incorporated under the laws of Florida that owns and/or operates prisons in the State of Oklahoma.

10. Defendant J. Michael Quinlan in his individual capacity and as former Vice President of Operations for Corrections Corporations of America ("CCA").

11. Defendant Frank Keating, in his individual capacity.

12. Mary Fallin, in her individual capacity and in her official capacity as Governor of the State of Oklahoma.

13. Defendant Joe Allbaugh in his official capacity as Director of the Oklahoma Department of Corrections

14. Defendant Delynn Fudge in her official capacity as Executive Director of the Oklahoma Pardon and Parole Board.

4

## JURISDICTION AND VENUE

15. This Court has diversity jurisdiction over Plaintiffs' claims against Defendants Quinlan, Hininger, CoreCivic, Inc. and its subsidiaries; Zoley, the GEO Group and its subsidiaries pursuant to 28 U.S.C § 1332.  The amount in controversy for each of these defendants exceeds $75,000.

16. This Court has subject matter jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331 and 1332  and 42 U.S.C. §§ 1981, 1983, and 1985.

17. Venue is proper in this court as the causes of action occurred within the Western District of Oklahoma.

18. Plaintiffs bring their claims against Defendant Fudge under 42 U.S.C. §§ 1981 and 1983.

19. Plaintiffs bring their claims against Defendant Allbaugh under 42 U.S.C. § 1983.

20. Plaintiffs bring their claims against Defendants J. Michael Quinlan, Damon T. Hininger, Core Civic Inc., George Zoley, The GEO Group, Mary Fallin, and Frank Keating under the provisions of 42 U.S.C. Sections 1981(a) and 1985 and 1988 for discrimination and conspiracy.

21. Plaintiffs bring their claims against Defendants Joe Allbaugh and DeLynn Fudge under the provisions of 42 U.S.C. §§ 1981, 1983.

## FIRST CLAIM FOR RELIEF
## CONSPIRACY IN VIOLATION OF 42 U.S.C. § 1985

22. Defendants Quinlan, Hininger and CoreCivic, Inc. (hereinafter referenced collectively as "CCA"), made corporate expenditures through lobbyists, and/or consultants and/or other parties to Defendants Keating and Fallin, as well as other high ranking state officials, to acquire and maintain influence over state criminal legislation and policy.

23. Defendants CCA did not make corporate expenditures through lobbyists, and/or consultants and/or other parties to Oklahoma Legislators who opposed private prison operations and/or who had no power to promote CCA's profit-driven legislative agenda.

24. Defendants Zoley and The GEO Group (hereinafter "GEO") paid money and gave gifts through lobbyists, consultants and third parties to Defendant Fallin and other high ranking state officials for the purpose of acquiring and maintaining influence over state legislation for the purpose of imprisoning human beings for as long as possible.

25. Defendants GEO did not make corporate expenditures through lobbyists, and/or consultants and/or other parties to Oklahoma Legislators who opposed private prison operations and/or who had no power to promote CCA's profit-driven legislative agenda.

26. Defendant Fallin received financial gifts from Defendants CCA and GEO.

27. Defendant Fallin and all other Oklahoma officials to which Defendants CCA and/or GEO made campaign contributions and/or in-kind contributions and/or other gifts of value obstructed criminal justice reform measures that would have meaningfully reduced Oklahoma's prison population.

28. Defendant Fallin knew that executing 98% occupancy guarantee contracts with Defendants CCA and GEO required payment of said contracts to be made from state tax payer funds.

29. Defendant Fallin has known since 1995 that Oklahoma disproportionately incarcerates African Americans as compared to similarly situated white offenders.

30. Defendant Fallin knew when she executed 98% occupancy guarantee contracts that said agreement required the State of Oklahoma to incarcerate a predictable number of people to meet the prisoner quota.

31. Defendant Fallin knew that the prisoner quota agreement would exacerbate the disparate and disproportionate incarceration of African American citizens.

32. There was a meeting of the minds between a) Defendants Quinlan and Keating and subsequently b) Defendants Fallin and CCA and c) Defendants Fallin and GEO to disseminate misinformation about public safety and crime rates to the public and legislators in order to create "buy in" and chill opposition to state expenditures to CCA and GEO.

33. The State of Oklahoma's expenditures over the past 20 years to CCA and GEO amount to billions of dollars and detrimentally impacted Oklahoma's state

7

budget and resulted in deep budget cuts to Education, Mental Health and other core services.

34. Decrease to Oklahoma's public education and mental health services budgets, and the increased incarceration and decreased parole of women has caused injury-in-fact to Plaintiff EVE's members.

35. Increased incarceration and decreased parole release has caused injury-in-fact to Plaintiff AllInOne's members.

36. Increased incarceration and decreased parole of African American citizens and prisoners has caused injury-in-fact to Plaintiffs The Advocacy Council's members and The Peoples Foundation's members.

37. Defendants Fallin and Fudge have the knowledge, information and authority to remedy prison overpopulation and to abate further disproportionate incarceration of African Americans but have obstructed efforts and/or refused to exercise their power to do so.

38. Defendants Fallin and Fudge knew that the PPB's pattern and practice of making arbitrary decisions to deny statutorily eligible prisoners meaningful parole consideration and release violates prisoners' 14th Amendment rights and disproportionately impacts African American men.

39. Defendant Fallin and Fudge knew that continuing to incarcerate parole-eligible prisoners would increase state corrections expenditures which would require decreased state spending on other core state services.

8

40.  Defendant Allbaugh knows or should know that his proposed expansion of Oklahoma's prison system will result in perpetuation of the disproportionate incarceration of African American citizens of Oklahoma.

### A. Obstruction of Reform Efforts

41.  The Oklahoma Legislature created the Oklahoma Criminal Justice Resource Center ("OCJRC") for the purpose of creating Truth in Sentencing legislation.

42.  The OCJRC created a structured sentencing matrix ("the Matrix") designed to create parity in sentencing so that sentences would be uniform, colorblind, and proportionate to the crime severity.

43. The State of Oklahoma Department of Corrections was awarded $1,389,635 by the Department of Justice Violent Offender Incarceration and Truth-in-Sentencing Incentive Grant.  Grant # 1996-CV-VX-0040.

44.  Shortly after partial enactment of the Truth in Sentencing Matrix, Defendant Keating, acting in his capacity as Governor of the State of Oklahoma, conspired with Defendant Quinlin to repeal the Matrix for the purpose of securing state contracts for Defendant CCA.  Keating announced his "Tough on Crime legislation," which was not justified by the FBI crime rate data for Oklahoma, as a pretext to justify repeal of structured sentencing.

45.  Defendant Keating's tough on crime legislation was a product of Defendant Quinlan's "free" consulting services on the Oklahoma "corrections problem." Defendant Keating adopted Defendant Quinlan's criminal justice legislation recommendations with knowledge of Defendant Quinlan's inherent conflict of

9

interest.    Defendant Quinlan was Vice President of CCA when he recommended that Defendant Keating enact tougher law, lengthier sentences, and confine Oklahoma's prisoners in CCA prisons.

46. Defendant Keating knew Defendant Quinlan had a duty to his corporation and stockholders to increase revenue by causing increased incarceration. Therefore, Defendant Keating knew that Defendant Quinlan acting as a free consultant on Oklahoma Corrections spending was an inherent conflict of interest.

47. Defendant Keating repealed the Matrix on the advice of Quinlan without prior approval from the Oklahoma Legislature.

48. Defendant Keating authorized approximately $66 million in contracts with CCA during his Administration.

**B. <u>Knowledge of Disparate Impact on African Americans and Women</u>**

49. All Defendants knew that Oklahoma disproportionately convicts, confines and denies parole to African Americans compared to white criminal defendants.

50. Oklahoma currently incarcerates more African Americans, per capita, than any state in the nation.  Louisiana has the highest per capita rate of overall incarceration; however, Louisiana ranks second-highest in the per capita incarceration of its African American citizens.  Both Louisiana and Oklahoma have prisoner quota contracts with GEO and CCA.  Compare:

   o African Americans account for 34.2% of the population in Louisiana

10

- o Louisiana incarcerates **1,740** per 100,000 of its African American citizens.

- o African Americans account for 7% of the population in Oklahoma

- o Oklahoma incarcerates **2,625** of its African American citizens.

51.  Comparing Oklahoma to Kansas demonstrates the unconstitutional outcomes in state imprisonment when corporate prison operators influence criminal justice policies.  Oklahoma and Kansas are neighboring states with much more similar demographics and crime rates than Oklahoma and Louisiana.  However, as of March 2018, Kansas had a prison population of 10,490 and Oklahoma's prison population was 27,164.  Over the past twenty years, Oklahoma has contracted with corporate prisons and Kansas has not.

## C. Purchased Influence Over Public Policy Making Violates the Hobbs Act

52.  Any contribution made to a state official for the purpose of directly or indirectly influencing any state law in a way that increases their profit constitutes a quid pro quo agreement and violates the Hobbs Act.  See 18 U.S.C. 1951.

53.  The business model of Defendants CCA described in a report to their stockholders is captured by Judith Greene, former consultant to the Oklahoma Criminal Justice Resource Center, in Prison Profiteers Chapter 12 "We Get By With a Little Help from Our Friends:

> *Our growth is generally dependent upon our ability to obtain new contracts to develop and manage new correctional and detention facilities. This possible growth*

11

*depends on a number of factors we cannot control, including crime rates and sentencing patterns in various jurisdictions and acceptance of privatization. <u>The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction and sentencing practices or through the de-criminalization of certain activities that are currently proscribed by our criminal laws.</u> For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, <u>thereby potentially reducing demand for correctional facilities to house them</u>…. Also, sentencing alternatives under consideration could put some offenders on probation with electronic monitoring who would otherwise be incarcerated.* (Emphasis added)

Corrections Corporation of America 2005 Annual Report

### D. <u>Defendant CCA and GEO Covert and Unmonitored Acts that Increase Sentence Duration</u>

54. Defendants GEO and CCA prison officials are able to increase sentence lengths because Defendant Fallin permits corporate case managers to conduct classification and impose discipline on prisoners without meaningfully monitoring these actions.

55. Specifically, one of Defendants GEO and Defendants CCA's sentence increase schemes is their pattern and practice of ordering "level drops." The level drop scheme involves threat by corporate prison employees to issue a disciplinary report for a feigned rule infraction and then offering to reduce prisoners' level in the alternative.

56. The State of Oklahoma created a statutory level system which grants earned credits (each credit being equivalent to one day) for continued good behavior.

12

57.  The Level System has four tiers.  Level 4 prisoners are awarded 44 extra days per month; Level 3 prisoners are awarded 33 extra days per month, Level 2 prisoners are awarded 22 extra days per month, and Level 1 prisoners receive no earned credits.

58.  The Oklahoma DOC calculates prisoners' sentence length by counting days. For example, a person with a ten year sentence is serving 3,650 days.  A Level 4 prisoner's sentence is reduced by 74 days each month.

59.  A Level Drop from Level 4 to Level 1 requires prisoners to "work their way back up" to Level 4, which takes one year or more.  By use of level drops on hundreds of prisoners per year, Defendants CCA and GEO  significantly increase their revenue and prisoners' sentence duration.

60.  Prisoner classification is a state function that directly impacts prisoners' liberty.  That Defendant Fallin authorizes GEO and CCA to classify prisoners constitutes unlawful delegation of state authority over prisoners to corporate actors.

### E.  Intentional Infliction of Emotional Distress

61.  Defendants GEO and CCA cause psychological damage to prisoners first by the mere fact that prisoners housed within their facilities have limited access to state prison officials.  The State's abandonment of its prisoners causes them to feel exploited, helpless, and continuously vulnerable to sabotage of their release at the hands of a corporation.  This is particularly devastating to

African American prisoners as they perceive being confinement for profit to be no different than slavery or convict leasing.

62.  Defendants CCA and GEO are warehousing human beings and the claims that they provide rehabilitation and education are patently misleading and false.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF THE EIGHTH AMENDMENT
### 42 U.S.C. § 1983

Plaintiffs reallege and incorporate by reference paragraphs 1-62 as if fully restated.

**A.**   **Eighth Amendment Cruel and Unusual Punishment**

63.  Defendants Fallin and Allbaugh know that Oklahoma has the highest prisoner homicide rate in the United States.   Oklahoma prisoners are murdered by other prisoners at a rate three times the national average.

64.  In a videotaped news interview in November 2016, Defendant Allbaugh summed up his observations on Oklahoma's prison crisis as follows:

> "Oklahoma's criminal justice system needs a massive overhaul…We have a mentality, much like Texas, lock 'em up and throw away the key….  the overcrowding is bad for several reasons.  First, there are not enough correctional officers, so prisoners join gangs for safety, which creates hardened criminals.  Second, the corrections officers, who are only armed with self-defense training and pepper spray, are in danger…Every minute of every day they're behind the wall, their life is at risk."

65.  The overcrowding, understaffing and violence in Oklahoma prisons is, in large part, due to Defendant GEO's and CCA's influence over the system in

14

general and the many ways these corporations manipulate the powers delegated to them by the state.

**B.**     **Expanding the Prison Industrial Complex Will Exacerbate the Problem of Overincarceration of African Americans and Women**

66.  Defendant DOC Director Joe Allbaugh has proposed building more prisons as the solution to the extreme overcrowding, understaffing and violence problem.

67.  Oklahoma does not rank number one in the number of citizens it incarcerates, per capita, because the rate of crime in Oklahoma warrants such incarceration. Oklahoma's incarceration rate is due contracts with Defendants GEO and CCA which in turn result in the State's failure to release prisoners when they are eligible for parole and its failure to repeal draconian laws that incarcerate persons for terms of life for crimes as petty as stealing a purse.

68.  Oklahoma State Statutes Title 21 § 51.1 the Habitual Offender Act, is unconstitutional as it is applied to people of color and poor people.

69.  Oklahoma State Statutes Title 63 § 2-401 the drug code is unconstitutional as it is applied to people of color and poor people.

70.  Oklahoma prosecutors are vested with quasi-sentencing powers (i.e. prosecutors recommend sentences in both plea bargaining and to jurors in all jury trials) and judges rarely deviate from prosecutors' recommendations. Lack of structured sentencing by judges was advocated for by CCA and GEO and is the major cause of prison overcrowding.

15

71.  Prosecutors routinely use the Habitual Offender Act to coerce sentences that are extraordinarily disproportionate to the charged offense.  For this reason, over 70% of the persons in prison in Oklahoma are being confined for decades for substance misuse and property related offenses.

72.  Statutes 21 O.S. § 51.1 and 63 O.S. 2-401 are arbitrarily applied in violation of the 14th Amendment, and all Plaintiffs request that these statutes be declared unconstitutional.

## THIRD CLAIM FOR RELIEF

### ARBITRARY AND PREFERENTIAL PAROLE SYSTEM
### VIOLATES 14TH AMENDMENT GUARANTEE OF EQUAL PROTECTION
### 42 U.S.C. §§ 1981 and 1983

Plaintiffs incorporate and reallege paragraphs 1-72 by reference as if fully restated.

A.  *Prisoners have the Right to Meaningful Parole Review Under the Oklahoma State Constitution, Oklahoma Statutes and are Protected against Arbitrary and Capricious Denial of Meaningful Parole Consideration and Release by the Fourteenth Amendment to the United States Constitution*

Oklahoma Statutes 22, Title 1514, provides in pertinent part that:

It is the goal of the Department of Corrections to … provide a fair and orderly progression through custody levels, and…[a]s an inmate demonstrates that he is no longer a threat to society, that the punishment has been effective and that a program of rehabilitation is showing progress, the inmate's level of custody may be ***commensurately reduced in an orderly progression through custody levels to parole and release from supervision***. (Emphasis added)

Oklahoma Constitution, Article VI § 10, provides in pertinent part that:

There is hereby created a Pardon and Parole Board to be ***composed of five members***; three to be appointed by the Governor; one by the Chief Justice of

16

the Supreme Court; one by the Presiding Judge of the Criminal Court of Appeals or its successor…. **It shall be the duty of the Board to make an impartial investigation and study of applicants for commutations, pardons or paroles,** and by a majority vote make its recommendations to the Governor of all deemed worthy of clemency….

The Governor shall have the power to grant, after conviction and **after favorable recommendation by a majority vote** of the said Board, commutations, pardons and paroles for all offenses.

73. Defendants Fallin and Fudge routinely conduct parole board hearings without a complete five-member board but nevertheless requires the applicant to secure three votes to meet the required "majority" vote.

74. The Oklahoma PPB rate of parole release of "violent" offenders from 40% to 1.9% of eligible candidates to maintain Defendant GEO and CCA's prisoner quotas.

75. Defendants Fallin and Fudge have a pattern and practice of arbitrary and capricious operation of the PPB which results in a disproportionate number of people who are statutorily eligible and fit for society being denied parole release.

76. Defendants Fallin and Fudge do not provide an explanation to prisoners for denying parole.

77. There is no state judicial or administrative remedy or review of parole decisions.

78. Defendants GEO and CCA manipulate parole eligibility to increase their profit by multiple internal schemes such as

17

a. Level drops (discussed above)

b. Failure to provide rehabilitative and educational programs

c. False disciplinary actions

d. Prisoners being sanctioned for contraband brought in or facilitated by corrupt prison guards

e. Participation in parole investigator pre-hearing reports

**B.    *The State's Failure to Apply the Matrix to Parole Applicants whose Offenses were Committed Prior to July 1, 1998***

79.  Prisoners who were charged with crimes committed prior to July 1, 1998, are a class of offenders most vulnerable to arbitrary denial of meaningful parole consideration and release.  Black men comprise a large subset of particular note within the class of pre-1998 prisoners.  Specifically, Black men who were convicted and sentenced in the 1970s and 1980s were convicted and sentenced based in part, if not entirely, on race and who are without judicial remedy due to a number of procedural factors.  Their only hope for release from prison is parole, and the process should be conducted in accordance with a statute created specifically for persons whose crime was committed prior to July 1, 1998:

80.  Title 57 Section 332.7, provides that:

"A. For a crime committed prior to July 1, 1998, any person in the custody of the Department of Corrections shall be eligible for consideration for parole at the earliest of the following dates:

Has completed serving one-third (1/3) of the sentence;

Has reached at least sixty (60) years of age and also has served at least fifty percent (50%) of the time of imprisonment that would have been imposed for that offense pursuant to the applicable Truth in Sentencing matrix….
….

F. The Pardon and Parole Board shall promulgate rules for the implementation of subsections A, B and C of this section. The rules shall include, but not be limited to, procedures for reconsideration of persons denied parole under this section and procedure for determining what sentence a person eligible for parole consideration pursuant to subsection A of this section would have received under the applicable matrix." (Emphasis added)

81.  From 1998 to the date of this filing, the Oklahoma PPB has failed to avail pre-1998 prisoners of the provisions of § 332.7.

82. Despite the statutory mandate, prisoners have no means of determining why they have been denied parole, what criteria are used to measure eligibility for favorable recommendation, and they have no mechanism through which they may appeal an adverse PPB decision.

83.  In addition to failing to adhere to § 332.7, Defendants Fallin and Fudge created a three-year offset policy that greatly increases the sentence duration of prisoners entitled to parole consideration pursuant to § 332.7's Matrix.

84.  Defendant Fallin and Fudge's failure to adhere to the Matrix, arbitrary operation of the PPB in general, and lack of judicial review of parole denial has resulted in the deprivation of liberty of many inmates for decades without justification or explanation.  Defendant Fallin has effectively designates these particular persons as commodities for Defendants CCA and GEO.

C.   **Three Year Offset of Parole Review Violates Prisoners' Guarantee Against Ex Post Facto Application of Administrative Policies**

85.   In the *pro se* case of *Henderson v. Scott*, the Tenth Circuit held that while the plaintiff proved that the offset of parole consideration from annual review to review every three years was an *ex post facto* imposition of the policy, the court went on to deny relief by articulating that Mr. Henderson had not demonstrated to the court how the thee-year offset increased the duration of his particular sentence.

86.   Any three-year offset extends the duration of a prisoners' sentences when the prisoner is otherwise statutorily eligible for parole release and was entitled to consideration every year.

87.   Article I, §9 Clause 1 of the United States Constitution prohibits states from passing *ex post facto* laws.  This is one of the relatively few restrictions that the United States Constitution made to both the power of the federal and state governments before the Fourteenth Amendment.  An *ex post facto* criminal law is one that 1) criminalizes actions that were legal when committed; or 2) aggravates a crime by bringing it into a more severe category than it was in when it was committed; or 3) changes the punishment prescribed for a crime, as by adding new penalties or extending sentences.

88.   In *Starkey v. Oklahoma Department of Corrections*, the Supreme Court of the State of Oklahoma found the Oklahoma Sex Offender Registration Act ("SORA") to be punitive in nature, if not in intent.  The Court held that "the

20

Department's retroactive application of the level assignment provisions of 57 O.S. Supp. 2007, 582.1 - 582.5, as amended, violates the ex post facto clause." *Starkey v. Oklahoma Department of Corrections,* 2013 OK 43 (2013).

89.  Finding the three-year offset is any less violative than *Starkey* is erroneous as such a finding does not comport with the letter or the spirit of Article I, §9 Clause 1.  Further, it is difficult to square the concept that a state act which substantially increases the time intervals between parole reviews would not facially demonstrate increase the duration of sentence.

90. **The Oklahoma Justice Task Force February 2017 Recommendations on Parole support Plaintiffs' allegations about the arbitrary and capricious nature of PPB operation and that affluent white parole and commutation applicants are given preferential review while Black parole and commutation applicants are often summarily denied.**

### Recommendation 18: Make the general parole process more transparent and coherent

"In the course of the policy development process, the Task Force conducted an intensive review of the parole code and found that many years of incremental changes to the parole process have resulted in statutory inconsistencies, which have, in turn, increased the burden on the Pardon and Parole Board to determine parole eligibility and paroling authority.  Concurrently, prosecutors, judges, and defense attorneys have struggled to estimate when individuals will be released based on their original sentences and have largely underestimated the time served by most inmates.

"The Task Force has sought to clarify the purpose of the parole process as a critical public safety tool, while at the same time creating greater certainty at sentencing, by creating clear statutory guidelines for parole processes.

**"The Task Force recommends:**

a. Establishing general parole eligibility at 25 percent of sentence with a mandatory period of 25 percent to be served prior to any form of release, meaning no person can be released prior to serving 25 percent of their sentence.

b. Creating a statement of legislative intent that describes the purpose of the parole process as a means of safely releasing compliant inmates in a timely fashion with the resources to be successful in the community.

c. Defining, in statute, the criteria that the PPB should be using to make the parole decision for those people who do not qualify for administrative parole.

d. Defining violent crimes for the purpose of the governor's parole consideration by adding statutory citations to 57 O.S. § 571.

e. Requiring that for all those whose parole is denied, the PPB shall state on the public record the reason for the parole denial and make recommendations to the individual for steps to address the cause of the denial.

f. Aggregating consecutive sentences for purposes of determining parole eligibility date.

g. Developing a structured, publicly available reporting worksheet for the PPB and their investigators to use in their decision-making.

h. Requiring that conditions and stipulations given by the PPB as part of parole release be evidence-based.

i. Allowing eligible inmates to be considered by PPB before their eligibility date, in order to be prepared for release at their eligibility date.**"**

## REQUEST FOR APPOINTMENT OF SPECIAL MASTER AND SUBSEQUENT APPOINTMENT OF A RECEIVER

91. Appointment of a special master and subsequent receiver is an extreme measure. However, it is the only effective way to create a lasting solution to Oklahoma's 20-year pattern and practice of disproportionate sentencing of and imprisonment of African Americans and women.

92. The Oklahoma Criminal Justice System has been fraught with unconstitional

patterns and practices that legislators, national advocacy groups and professional auditors have tried to remedy.  Each proposed legislative remedy was obstructed and failed.  The history of failed proposals tends to indicate that without federal court orders to carry them out, the February 2017 Oklahoma Justice Task Force Recommendations will fail to be enacted or will be enacted and later repealed.

93. Defendant Fallin has expert analyses of Oklahoma's corrections system from the Oklahoma Criminal Justice Resource Center in 1997, the MGT Special Audit to the Oklahoma Legislature in 2001, the Council on State Governments and PEW Justice Reinvestment Initiative in 2012, none of which she enacted despite the millions of dollars the State of Oklahoma spent to have expert generate findings and recommendations.

94. Appointment of a Special Master in necessary to cure the disproportionate sentencing and duration of confinement to ensure that true public safety goals are accomplished without the influence of corporations that commodify and monetize human beings.

95. Appointment of a Special Master will lay the evidentiary groundwork for a Receiver in the likely event that the Oklahoma Legislature enacts some counter measure to maintain the status quo.

## RELIEF REQUESTED

1) Damages exceeding $75,000 against Defendant Zoley

2) Damages exceeding $75,000 against Defendant Quinlan

3) Damages exceeding $75,000 against Defendant GEO

4) Appointment of a Special Master(s) to monitor all decisions and policy implementation of the Oklahoma Pardon and Parole Board to ensure equitable and meaningful parole consideration and parole release for eligible candidates.

5) Declaration that the 98% occupancy guarantee contracts with Defendants CCA and GEO Group and any other prisoner quota guarantees by state officials are unconstitutional and an Order that any prisoner quota guarantees with Oklahoma be dissolved.

6) Appoint a Special Master to examine and report on all existing contracts with the State of Oklahoma to which a citizen is subject by operation of state, county or municipal order including but not limited to the "GEO Continuum of Care" and the "CoreCivic Community" which are emerging schemes to contract with state governments and that will expand correctional control under the pretext of provision of treatment services.

7) Order the award of attorney's fees, expert witness fees and all other costs of litigation.

8) Order any other relief that it believes to be just and proper.

Dated April 4, 2018

s/Rand C. Eddy
Rand C. Eddy, OBA # 11822
Eddy Law Firm, P.C. 210 Park Avenue, Ste. 3030
Oklahoma City, Oklahoma 73102
Telephone: (405) 232.3800
Facsimile: (405) 232.8999
rand@lawokc.com
*Attorney for Plaintiff The Advocacy Council*
*Attorney for Plaintiff AllInOne Project*
*Attorney for Plaintiff The Peoples Foundation*

24